APPLETON *v.* RISHER.

Opinion delivered December 22, 1930.

*W. S. Goodwin* and *Shields M. Goodwin*, for appellant.

*C. C. Hollensworth* and *Clary & Ball,* for appellee.

HUMPHREYS, J. Appellant brought this suit on the 2d day of January, 1929, against appellees in the Second Division of the Chancery Court of Union County to cancel a deed to 27.64 acres of land in said county, together with the ferry operated therefrom across Ouachita River, executed by Dr. Garrett B. Browne, to J. E. Risher on December 24, 1928, upon the alleged grounds that Dr. Browne was of unsound mind when same was executed, and that appellees procured its execution through undue influence.

Appellees filed an answer to the complaint on January 19, 1929, denying the material allegations therein.

On February 2, 1929, Dr. Browne died, and the cause was revived on February 1, 1930.

Thereafter, on May 15, 1930, appellees filed an amended answer and also a cross-complaint alleging therein that the deed sought to be canceled was executed in accordance with and pursuant to an agreement signed and delivered to them by Dr. Browne in November, 1927, in words as follows:

"I, G. B. Browne, agree to give to J. E. Risher one-half of my income from now on until I take my bed and after that all my income. I hereby agree to deed him the 28 acres of land and the ferry and ferry rights. This is binding on me from now on. At my death he shall have all the money, land which I may own. I am to have a home with J. E. Risher the balance of my days for this, and neither of us can back out now or later. I have paid him $20 to bind us. I will make a deed when I return from Illinois, but, should anything happen that I fail to do this, then the property is J. E. Risher's anyway. He agrees to hold a home for me.

"G. B. Browne, M. D."

It was further alleged that after Dr. Browne returned from Illinois he went to live with appellees on January 15, 1928, and continued to abide with them until removed to the hospital in Warren on December 26, 1928; that soon after taking up his abode with them he had a second stroke of paralysis rendering him helpless, and thereafter they cared for him and nursed him as long as he remained in their home.

The prayer of the cross-complaint was that, in the event the deed should to the land and the ferry rights be canceled, appellees be accorded a specific performance of the agreement.

Appellant filed an answer to the cross-complaint denying that the deed was made pursuant to the alleged agreement or that same was adopted and acted upon by the parties regarding Dr. Browne's entertainment in appellee's home, but that, on the contrary, appellees cared for and nursed Dr. Browne in their home for a stipulated consideration of $90 a month.

The cause was submitted to the court upon the pleadings and testimony, resulting in a finding that the deed was voluntarily executed by Dr. Browne pursuant to the agreement made in November, 1927; and that he was mentally capable of executing the deed.

The decree was rendered in accordance with the findings dismissing the complaint of appellant, and the cause is here on appeal for trial *de novo*.

The record reflects the following undisputed facts: On January 15, 1928, Dr. Browne returned from a visit to Illinois and repaired to the home of appellees where he remained until December 26, 1928, at which time he was removed to Dr. W. L. Hartwell's hospital at Warren for care and treatment. January 15, 1928, when Dr. Browne took up his abode with appellees, he was paralyzed on one side and needed help to walk. Some time in March, 1928, he had another stroke, and dating from that time he was bedridden and practically helpless.

On May 15, 1928, Dr. Browne executed a will in which he devised one dollar to his daughter and all his other property to Todd Kellar Shaner, a grandchild, in whom he had taken great interest and to whom he was devoted. Some time in the fall of 1928, J. E. Risher went to the home of Jim P. Johnson, a justice of the peace, and requested him to go to their home and take the acknowledgment of a deed from Dr. Browne to him to a tract of land at Moro Bay, together with the ferry rights. When the justice read the deed to Dr. Browne he refused to sign it because it conveyed all he had and was not the paper he expected to sign.

On December 17, 1928, J. E. Risher went from his home at Moro Bay to Warren, at the request of Dr. Browne, to see W. S. Goodwin with reference to a power of attorney, a deed and a will which had been prepared by Judge McKnight. He directed Mr. Goodwin to redraft the deed so as to eliminate the cause reserving in Dr. Browne the right to control the ferry and ferry privileges. The power of attorney authorized J. E. Risher to attend to all of Dr. Browne's business and especially to collect the ferry rents. The deed as redrafted conveyed the 27.64-acre tract of land and ferry rights to J. E. Risher and the will devised all of his property to J. E. Risher. J. E. Risher informed Mr. Goodwin that Dr. Browne wanted to consult him. Mr.

Goodwin went home with J. E. Risher, a distance of about six miles, for the purpose of interviewing Dr. Browne, arriving there after sundown, where he spent the night. When Mr. Goodwin entered the room occupied by Dr. Browne, the doctor told him that Mr. Risher wanted him to sign those papers but that he was not going to do it. After his refusal to sign the papers Mr. Goodwin walked into an adjoining room where Mr. Risher was standing. Mr. Risher asked Mr. Goodwin what Dr. Browne said about signing the papers, and was told by him that Dr. Browne was not going to sign anything. Mr. Risher asked him why, and Mr. Goodwin told him Dr. Browne said that he wanted all that was left to go to his grandson, and that the papers which Risher wanted Dr. Browne to sign conveyed everything Dr. Browne had to him (Risher). Mr. Risher said: "He'll sign them; yes, he'll sign them." When Mr. Risher came out of Dr. Browne's room after taking his supper to him, he said, "I asked him if he was going to sign those papers and he said to wait until in the morning, and I will see Mr. Goodwin." The next morning Mr. Risher told Mr. Goodwin he had asked the doctor if he was going to sign those papers, and Dr. Browne told him that he thought he would, but that he wanted to talk to you before he did so. Mr. Goodwin went in Dr. Browne's room about 7:30 on the morning of the 18th and remained until 11 o'clock. During the time Mr. Risher came into the room about six times. He asked Dr. Browne in a commanding sort of way, "Doctor, aren't you going to sign those papers?" and the doctor said "No." Dr. Browne then expressed a desire to go to the hospital at Warren for treatment, and Mr. Goodwin replied that he would communicate with his relations, and if they were willing he would make arrangements to take him to the hospital. Mr. Goodwin left and immediately communicated with Dr. Browne's relatives and received directions to take Dr. Browne to the hospital, which he did on December 26, 1930, over the protest of appellees. On the way to the hospital Dr. Browne told

Mr. Goodwin and Dr. Martin, who was assisting in his removal to the hospital, that he signed some papers, but had done so under threat of the Rishers that unless he signed them that they would move away and let the hogs and dogs get him. (The Rishers denied making such a threat). The papers referred to consisted of a deed and a will executed by Dr. Browne on December 24, 1928. The deed is the one redrafted by Mr. Goodwin and conveyed the 27.64 acres in question with ferry rights to J. E. Risher in consideration of maintenance and support. The will devised all his property to J. E. Risher.

On the 26th day of December, 1928, when Dr. Browne was brought to the hospital, he was afflicted with tuberculosis, cancer and paralysis. He was unable to use any part of his body on the left side and could only use his right hand a little. He had suffered two strokes of paralysis, one in 1927 and the other in the spring of 1928. The record is silent concerning the first appearance of tuberculosis and cancer. As a result of his bedridden condition after March, 1928, he had a sore upon his back which was black and contained proud flesh. On December 31, 1928, appellant was appointed guardian of the person and estate of Dr. Browne, a person of unsound mind. On February 2, 1929, Dr. Browne died. The purported last will and testament of Dr. Browne, executed on the 24th day of December, 1928, was contested by the beneficiary in the will executed on May 15, 1928, in the probate court and in the circuit court on appeal, upon the same grounds that the deed in question is sought to be canceled; and the judgment in both courts denied to probate the will of date December 24, 1928, and admitted to probate the will of date May 15, 1928.

The direct testimony introduced by the appellant and that introduced by appellees upon the issues of the state of mind of Dr. Browne on December 24, 1928, the date he executed the deed in question, and whether undue influence was used to procure the deed, is conflicting.

Dr. C. M. Martin, who helped remove Dr. Browne to the hospital on December 26, 1928, testified that there

was nothing to indicate a change in his condition for the worse on or after the 24th day of December, 1928, and that Dr. Browne on either day was not capable of appreciating or retaining in his memory the extent of his property or relation of persons he might include or exclude from participating in his estate.

Dr. W. L. Hartsell who attended him three or four times a day and kept a nurse with him constantly after he entered the hospital testified, in substance, to the same effect as Dr. Martin. He positively stated that Dr. Browne had a low mentality and frequently contradicted himself and was unable to concentrate on any subject over three minutes.

Mrs. Fannie Denson, who nursed Dr. Browne after he entered the hospital, testified that his condition was very serious; that he had a black sore about the size of her hand on his back on which the flesh was about ready to drop off; that his mind would just come and go.

R. M. Hutchins testified that he was called to see Dr. Browne on December 22, 1928, to consult him with reference to instituting a suit against his daughter, Mrs. Norris, to cancel through court proceedings a deed which he had previously executed to her; that Dr. Browne gave him information that he desired and upon which he brought the lawsuit; that he saw him again about the middle of January, 1929, and discussed the lawsuit with him; and, that from these two interviews he discovered that Dr. Browne was physically incapacitated, but that he was mentally awake and sound.

Dr. J. W. Shaw testified that he was personally acquainted with Dr. Browne, and that on the 20th day of December, 1928, he was called to see Mr. Risher's little daughter; that he went into Dr. Browne's room and talked with him; that, although bedridden and in a helpless condition, he concluded, from his conversation that his mind was sound.

Dr. W. H. Reasons testified that he had a talk with him in Risher's home in Moro Bay either December 22 or 23, 1928, and that, after conversing with him for about

fifteen or twenty minutes, he impressed him as being altogether sane.

A number of lay witnesses, introduced by appellees, testified that they had visited Dr. Browne while he was making his home with the Rishers, and that their several conversations with him indicated that he was in his right mind.

W. S. Goodwin testified that on the morning of the 18th of December, 1928, Dr. Browne said that the reason he would not sign the deed was that his contract with the Rishers was that he would pay them for their services, and that he had done so; that Dr. Browne told him in the presence of Mr. Risher that he had $1,100 in the bank, and that Mr. Risher allowed both of them to rest under the belief that the money was still in the bank when as a matter of fact it had already been drawn out by Mr. Risher; that Dr. Browne also requested Mr. Risher to turn over two checks to him to deposit and that at first Mr. Risher agreed to do so but later said he had already cashed them, and, in justification, claimed that Dr. Browne had made him a present of them, Dr. Browne denied having done so; that during the altercation over the checks Dr. Browne claimed to own the automobile Mr. Risher was using, to which Mr. Risher replied, "Only as long as you live." Dr. Browne then asked, "Why did you say that?" Mr. Risher answered, "When you die, I am going to have that car."

L. L. Smith testified that during the month of September, 1928, he was in the home of J. E. Risher at Moro Bay and had a conversation with Dr. Browne in the presence of Mr. Risher with reference to an agreement Dr. Browne made with Risher when he came to his home concerning how much he was to pay the Rishers for keeping him; that during the conversation Mr. Risher wanted Dr. Browne to give him a check; that Dr. Browne told Mr. Risher he had already paid him $2,500, and that he had only agreed to pay him $90 a month for taking care of him; that Mr. Risher was present and did not deny that the agreement was that Dr. Browne should pay

him $90 a month; that he was present on the 15th day of May, 1928, when Dr. Browne executed a will in favor of his grandson, Todd Kellar Shaner; that Mr. Risher was also present; that Mr. Risher put his arm under Dr. Browne's shoulder and raised him up when he signed the will; that when Dr. Browne signed the will Mr. Risher made no reference to a written contract having been executed by him in November, 1927, and entered no protest against the execution of the will by Dr. Browne.

Appellant introduced testimony tending to show that appellee, J. E. Risher, had received in the neighborhood of $2,500 in cash from Dr. Browne during the 11 months he was in his home.

Mrs. Pearl Holmes testified that Dr. Browne returned from Illinois early in 1928; that she heard him tell Mrs. Risher that if she would take care of him he would will her everything he owned at his death; that he made no mention of his grandson at the time.

Elvin Parker testified that Dr. Browne told him in August or September, 1928, that his daughter had kicked him out, and that he intended for Mr. Risher to have everything he owned at his death; that at the time he made no mention of his grandson.

Allen Shinpock testified that Dr. Browne told him the latter part of 1927 that he was going to will the rest of his property to Elmo Risher, and said nothing about his daughter or his grandson at the time.

J. E. Risher testified that the contract was executed in November, 1927, agreeing to give him his property, and that the deed and will were made pursuant to the written contract; that he and his wife had not made any threats or used any force to procure the deed and will in his favor from Dr. Browne; that the deed and will were executed by Dr. Browne voluntarily; that he was not present and did not hold up Dr. Browne's head on May 15, 1928, when he executed the will devising all of his property to his grandson; that he received only about $1,200 in cash from Dr. Browne during the time he was in his home; that he did not hear Dr. Browne say anything to Mr.

Goodwin about an agreement to pay him for his services and that he had done so; that he did not deceive him about Dr. Browne having money in the bank and did not have any altercation with him in Mr. Goodwin's presence concerning checks or the ownership of the automobile; that he did not hear Dr. Browne say anything to L. L. Smith about an agreement to take care of the doctor for $90 a month, and that no such statement was made to Smith in his presence; that he objected to Dr. Martin and Mr. Goodwin taking Dr. Browne to the hospital because he did not regard it as necessary, and because Dr. Browne was satisfied to remain with them.

Mrs. J. E. Risher said that no force was used by them in procuring the deed or will, and that Dr. Browne was removed to the hospital by force; that the deed and will were made to J. E. Risher pursuant to a promise to convey everything he had to her husband if they would allow him to make his home with them.

Appellant contends for a reversal of the findings and decree of the chancery court upon the alleged ground that both the findings and decree were contrary to the weight of the evidence. We agree with him in this contention. The deed was executed at a time when Dr. Browne was suffering from a complication of diseases. His long suffering had rendered him a physical wreck. He had had two paralytic strokes resulting in his inability to move any portion of his body except his right hand a little. He had been bedridden since March, 1928, and had one bed sore upon his back from which the flesh was about to drop. The physicians who attended him in a professional capacity on and after the 26th day of December, 1928, two days after the execution of the deed in question, testified that he could not have been mentally capable of knowing the extent of his property on December 24, 1928. The nurse who cared for him corroborated their testimony. Their conclusion as to his mental incapacity seems to be the natural result of his physical condition. Dr. Browne's physical inability is an admitted fact in the record. It is true a number of witnesses,

including two physicians, testified that Dr. Browne was sane near the time the will was executed, but we are convinced from all the testimony that he had very little, if any, resisting mental power left at the time he executed the deed and will. According to the weight of the testimony he executed a deed and will to Mr. Risher which he had refused to execute a short time prior to the execution thereof.

It is also reflected by the record that Mr. Risher was very anxious to get both instruments signed by Dr. Browne. Mr. Risher does not deny Mr. Goodwin's statement that he stoutly insisted upon Dr. Browne signing the power of attorney, the will and the deed on the night of the 17th and the morning of the 18th day of December, 1928. Mr. Risher admits that he refused to sign either in the presence of Mr. Goodwin. The testimony of Jim P. Johnson stands in the record uncontradicted that Dr. Browne also refused to execute the deed. We think the only conclusion that can be drawn is that Dr. Browne executed the deed at a time when he was weak in mind either through undue persuasion or under threat, and that the execution thereof was not a voluntary act on his part.

It is argued by appellees that, even though the deed should be canceled, the written agreement signed by Dr. Browne in November, 1927, should be upheld and the findings and decree of the chancellor should be sustained under the terms of the agreement. The agreement was not heard of until it was introduced in the trial contesting the will in which J. E. Risher was made the beneficiary. The contract was not set up in defense of this action during the lifetime of Dr. Browne. No mention was made by J. E. Risher of such a contract according to the testimony of W. S. Goodwin and L. L. Smith, both of whom state that Dr. Browne said in the presence of J. E. Risher that the contract was that he should pay the Rishers $90 a month for his services, and that he had more than paid them. It is true that Mr. Risher denied that such a statement was made in his pres-

ence either to Mr. Goodwin or to Mr. Smith, but he also contradicted the testimony of L. L. Smith relative to the execution of a will on the 15th day of May, 1928, in favor of Dr. Browne's grandson. Mr. and Mrs. Risher both testified that they did not know of the execution of the will on the 15th day of May, 1928, and just how it could have been executed in their home on that date, by a bedridden man, without some knowledge on their part of him having done so is hard to understand. We think the only reasonable conclusion that can be reached under the testimony detailed is that the written contract was abandoned, and that an oral agreement in substitution therefor was made between Dr. Browne and the appellees to the effect that he would pay them $90 a month for their services during his life, and that according to the undisputed evidence he paid at least that much, if not more, before he left their home.

The decree is therefore reversed, and the cause is remanded with directions to the chancery court to cancel the deed and the written contract introduced in evidence.